IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GTAS ASSET SOLUTIONS,          :
LLC,                           :
                               :
        Plaintiff,             :
                               :        CIVIL ACTION NO.
v.                             :        1:11-CV-1148-RWS
                               :
AFRICAN METHODIST              :
EPISCOPAL CHURCH, INC., *et*   :
*al.*,                         
                               
        Defendants.

## ORDER

This case comes before the Court on Defendant African Methodist

Episcopal Church, Inc.'s [hereinafter, "AME"] Motion to Dismiss Counts 4 and

5 [62], Defendant AME's Motion for Summary Judgment [79], and Defendant

Morris Brown College's [hereinafter, "MBC"] Motion to Join and Adopt

AME's Motion for Summary Judgment [89].[1] After a review of the record, the

Court enters the following Order.

---

[1]Plaintiff has not opposed this motion; thus, the Court will **GRANT** the motion and will consider [79] as a motion on behalf of both Defendants. See LR 7.1(B), NDGa ("Failure to file a response shall indicate that there is no opposition to the motion.").

**I. Factual Background[2]**

    **A. The Parties**

        1. Plaintiff

GTAS Asset Solutions, LLC [hereinafter "GTAS"] was established as a holding company for the 1996 Bonds, see *infra*, and does not have any employees. Dkt. No. [80-3] at ¶ 1. GTAS is wholly owned by VS Non-Senior Housing Holdings, LLC [hereinafter "VSNSHH"], and VSNSHH, Gerald Timmis, and Larry Jennings are members of GTAS. Id. at ¶ 2. VSNSHH is owned by Valstone investment funds.

Valstone Partners [hereinafter "VP"], f/k/a Touchstone Partners, is a SEC-registered investment advisory company that creates investment funds, like VSNSHH, and sells them to sophisticated investors. Id. at ¶¶ 3, 8. Larry Jennings is a partner and the senior managing director of VP, has a bachelor's and MBA from Carnegie Mellon, and has worked in the investment industry for over 25 years. Id. at ¶¶ 9, 11. Jennings and his partner, Gerald Timmis, make all of the investment decisions for the funds, including those relevant here. Id. at ¶¶ 9-10. VP invests in real estate and debt secured by real estate and has a current

---

[2]The following facts are drawn most favorable to the Plaintiff as the non-movant.

capital value of $275 million. Id. at ¶ 4. Specifically, VP specializes in

distressed debt and seeks to provide investors with the highest rate of return. Id.

at ¶ 5. To do so, Jennings testified that he always wants more collateral to

improve his position and to increase the ultimate value of VP's investment. Id.

at ¶ 7.

As well, Plaintiff–and its predecessor in interest–is a sophisticated

institutional investor who is capable of evaluating the risks of its investments.

Id. at ¶ 19. In fact, the company acknowledged in writing that is was capable of

doing so with the bond purchase here. Id.

### 2. Defendants

On July 31, 1906, "Morris Brown College of the African Methodist

Episcopal Church" was incorporated as a non-profit corporation. Pl.'s SMF,

Dkt. No. [93] at ¶ 1. In its incorporation application, the incorporators stated

that the college was established "by the Executive Committee of the Board of

Trustees appointed by the North Georgia Conferences of the African Methodist

Episcopal Church of the United States of America." Id. On June 5, 1912,

"Morris Brown College of the African Methodist Episcopal Church" changed

its name to "Morris Brown College," but stated that MBC was "an institution of

the African Methodist Episcopal Church of Georgia." Id. at ¶ 2.

In 1976, MBC stated that its corporate purpose was to conduct "an institution of higher learning which shall render and extend, under Christian influence embodying the tenets and precepts of the African Methodist Episcopal Church and under the auspices of said church." Id. at ¶ 3. The articles of incorporation also stated that MBC "shall have no power or authority to commit any act or omission, or engage in any activity which is in contravention or violation of . . . the African Methodist Episcopal Church or any mandate or directive issued by any General Conference of the African Methodist Episcopal Church." Id. However, MBC's Board of Trustees deleted its requirement to follow AME mandates in 2008 because they wanted to "separate the authority of the Church from the administration of the College." Id. at ¶ 4.

AME is composed of twenty districts, and the Sixth District is composed of the Georgia AME congregations. Id. at ¶¶ 5-7. However, the Sixth District is not a separate entity from AME generally, and all of the districts "come under [AME's] 501(c)(3)" tax exemption. Id. at ¶¶ 8-9.

In 2004, Bishop Willy DeVeaux became the Bishop of the Sixth District, the highest officer of that district. Id. at ¶ 10. As the Sixth District's Bishop, DeVeaux reports to the AME Council of Bishops and the AME General Board, and he serves on the AME General Board, along with the other district bishops

4

and the elected members from each district. Id. at ¶¶ 11-12. The Sixth District's

Bishop also sits on MBC's Board of Trustees per the MBC Bylaws, and the

MBC Charter gives the Sixth District's Bishop the deciding vote in the event of

a tie vote by the MBC Board. Id. at ¶ 14. DeVeaux became the Chairman of

MBC's Board in 2005. Id. at ¶ 16.

### B. AME and the Sixth District Financially Support MBC.

In 2003, the "AME 6th District" took out a 2.5 million dollar line-of-

credit from Citizens Trust Bank "for the benefit of Morris Brown College"

because MBC was in a "financial crisis." Id. at ¶ 17. On September 5, 2004,

AME executed an Unconditional Guaranty of Payment and Performance to

guarantee that line of credit and did not receive any consideration in return for

the guarantee. Id. at ¶¶ 18-19. AME now makes payments on the line-of-credit,

and MBC has not given AME anything in return for these payments. Id. at ¶ 20.

Additionally, the Sixth District has provided other funds to the school.

From May 2006 through at least July 2007, the District paid the $4,000 monthly

salary of Dr. Stanley Pritchett, who served as a consultant and Chief College

Administrator during that time. Id. at ¶¶ 21-24. It also gives MBC a $250,000

annual "gift" to help operate the school. Id. at ¶¶ 26-27. And beyond the

$250,000 gift, the District also "advances" money to MBC for its operations. Id.

at ¶ 28. For instance, in 2005, the District provided over $1,000,000 for MBC's operating expenses, including payroll, insurance premiums, accounting fees, legal fees, and payments on MBC's outstanding Department of Education debt. Id. at ¶¶ 29-30. While these funds were provided in the form of a loan, MBC has not repaid any of these funds to the District and the District has not demanded payment. Id. at ¶¶ 29, 35. Additionally, MBC's audited financial reports for 2006 and the first half of 2007 did not reflect any outstanding debts owed by MBC to the District. Id. at 36.  AME also provides an annual allotment to MBC of approximately $300,000. Id. at ¶ 37.

### C. MBC's Relevant Debt History

#### 1. 1970 Bonds

On May 1, 1970, the U.S. Department of Housing and Urban Development ("HUD") issued MBC Housing and Facility Bonds of 1970, Series A-E, in the original principal amount of $4,485,000 ("1970 Bonds"). Id. at ¶ 38. To provide security for those loans, the HUD Secretary and Citizens Trust entered into a trust indenture, whereby Citizens Trust agreed to act as trustee on behalf of the 1970 Bonds holders, and MBC granted Citizens Trust a mortgage on real estate property commonly known as John Middleton

6

Complex, Wilkes Hall, Gaines Hall, and the Hickman Student Center. <u>Id.</u> at ¶¶ 39-40.

### 2. 1996 Bonds

In August 1996, the Development Authority of Fulton County issued Revenue Refunding Bonds to MBC in the original principal amount of $13,100,000. <u>Id.</u> at ¶ 41. Like the 1970 Bonds, Citizens Trust and Fulton County entered into a trust-indenture agreement, and MBC pledged the John Middleton Complex, Jordan Hall, and the Administration Building as collateral. <u>Id.</u> at ¶¶ 42-43. Additionally, these bonds were also secured by a guarantee from MBC which allowed the debt holder to impose liens on any other MBC property if MBC defaulted. <u>Id.</u> at ¶ 43. U.S. Bank National Association ("U.S. Bank") succeeded Citizens Trustee as the trustee under the 1996 Bonds for all times relevant to this suit. <u>Id.</u> at ¶ 44.

### 3. 2005 Capital Notes.

On February 16, 2005, MBC entered into a one-year capital notes agreement with Capital Mortgage Corporation, First Financial Funding, Inc., and Prime Equity Lending, Inc. totaling $2.5 million. <u>Id.</u> at ¶ 45. The notes were secured by most of MBC's remaining unencumbered property, including Herdon Stadium, Furbur Cottage, Griffen Hightower, Hamilton College, the

7

Sara Allen Quad, the Administration Building, the Post Office, and many vacant land parcels. Id. at ¶ 46. Records related to this transaction were filed February 17, 2005 with the Superior Court of Fulton County Clerk. Dkt. No. [80-3] at ¶ 31.

### D. AME's Purchase of MBC's Outstanding Debt

On February 16, 2006, the 2005 Capital Notes matured, and MBC did not make any payments in this period. Dkt. No. [93] at ¶¶ 48-49; Dkt. No. [77-31] at 30-31. However, those lenders agreed not to pursue any remedies against MBC if it paid the 2005 Notes in full by April 14, 2006. Dkt. No. [77-31] at 30-31.

On March 30, 2006, a "Select Committee" of AME Bishops met to determine how to "get enough money in order to gain some control back into the hands of Morris Brown College/the AME Church." Dkt. No. [77-25] at 55. Four days later, the AME Council of Bishops met to discuss MBC's outstanding debts. Dkt. No. [93] at ¶ 53. Bishop DeVeaux told the Council that "MBC was in an urgent situation with short-term debt of $3.8 million due April 14, 2006, and a need to pay arrears and penalties on bond on which we have already defaulted." Id. at ¶ 54. The minutes also reflect that "the most urgent

8

action [was] to settle with Lipsky[3] [the 2005 Capital Notes holder] and to buy back the outstanding GMAC bonds, thus releasing the lien on the land ($2.9 + $.9 = $3.8 million dollars). Mr. Lipsky's loan [the 2005 Capital Notes] is secured by the property with 1st-2nd liens." Id. at ¶ 55. As well, the minutes state, "[W]e go to Wachovia Bank to request a loan for $11 million and a $4 million bridge loan to return control of MBC property to the hands of MBC/AMEC." Id. at ¶ 56.

On the same day, the Executive Committee of the General Board of AME met "for the purpose of concurring with recommendations of the Council of Bishops for the resolution of the crisis at Morris Brown College . . . ." Id. at ¶ 57. The AME Executive Committee also discussed obtaining a short-term $4 million loan to purchase the 2005 Capital Notes and the GMAC loan, the 1970 Bonds. Id. at ¶ 58. Ultimately, the Executive Committee's "most immediate goal [was] to put control of MBC property in the hands of MBC/AMEC." Id. at ¶ 59. At the end of the meeting, the Executive Committee approved purchasing the 1970 Bonds and the 2005 Capital Notes "to protect the properties so that Morris Brown could survive and develop new interests and expand," and the AME General Board approved AME's purchase. Id. at ¶ 61. AME purchased

---

[3]This is a misspelling of the loan-holder's name, Lipsitz.

the 2005 Capital Notes "[t]o assist Morris Brown College, which has its AME name and logo." Id. at ¶ 63.

Bishop DeVeaux attended the AME Council of Bishops in his capacity as Bishop of the Sixth District and also approved MBC's purchase of the Capital Notes, along with others, in his capacity as MBC Chairman. Id. at ¶ 65. DeVeaux approved of AME's purchases because he had "concerns about the property not being in the hands of the school and church." Id. at ¶ 66, 78. But, AME is still obligated to pay a loan to BB&T which it took out to fund its acquisition of the 2005 Notes and the 1970 Bonds. Dkt. No. [80-3] at ¶ 43.

On April 12, 2006, Douglass Selby of Hunton & Williams wrote the 2005 Capital Notes holder, Ronald Lipsitz of Capital Mortgage Corporation, and advised him that he had the funds from AME to "payoff" the 2005 Capital Notes. Dkt. No. [93] at ¶ 67.  On April 13, 2006, AME obtained the Notes, and the transfer and assignment was filed with the Superior Court of Fulton County Clerk the next day. Dkt. No. [80-3] at ¶ 39. On June 24, 2006, Selby wrote Dr. Lewis that he had completed AME's acquisition of the 1970 Bonds and 2005 Capital Notes. Dkt. No. [93] at ¶ 68. Bishop DeVeaux understood that Selby represented MBC and AME in the 2005 Capital Notes purchase. Id. at ¶ 69. Following this purchase, MBC did not list the 2005 Capital Notes debt–a $2.5

million dollar line-of-credit–in its debts, and Note 6 to the June 30, 2006 financial statement stated that the line-of-credit had been "paid as of April 2006." In fact, nowhere in its June 2006 or 2007 annual financial statements did MBC list the 2005 Capital Notes as a debt to AME. Id. at ¶¶ 72-74. MBC has never made a payment to AME under the 2005 Capital Notes, and AME has never exercised any of its rights under the Notes. Id. at ¶ 76. As of June 30, 2007, MBC showed its outstanding debt to AME as only $544,726.26. Id. at ¶ 75. However, AME's audited financial statements do show that the 2005 Note and 1970 Bonds are receivables from MBC. Dkt. No. [80-3] at ¶ 44.

On June 2, 2006, AME purchased the 1970 Bonds. Dkt. No. [93] at ¶ 79. Soon after, AME noticed a foreclosure on Middleton Towers, a property which was collateral under those bonds. Id. at ¶ 81. However, that notice was quickly retracted in July 2006. Id. at ¶ 86. Selby, AME's counsel, stated to Dr. Lewis of AME, "As we discussed, we orally directed the Trustee to foreclose on certain property at Morris Brown in an effort to signal to Touchstone Partners (Larry Jennings) the Church's resolve to be fairly treated in the workout." Id. at ¶ 87.

Since AME purchased the 1970 Bonds, MBC has not made any payments, and Dr. Pritchett does not recall AME taking any steps to enforce its rights in the secured property. Id. at ¶ 90. On April 11, 2011, Citizens Trust

11

Bank sent a Notice of Continuing Defaults to Dr. Pritchett regarding MBC's default. Id. at ¶ 91. On April 14, 2011, Dr. Pritchett forwarded the Default Notice to Selby and Bishop DeVeaux and stated, "I am attaching a recent communication received from CTB. It was my understanding that the AME Church was the holder and no payment was needed since all of the money is owed to the AME Church." Id. at ¶ 92.

### E. Plaintiff's Involvement.

In February 2006, Plaintiff was assigned and transferred a 100% interest in the 1996 Bonds by the original bondholder. Id. at ¶ 93. At the time, Plaintiff paid $5,320,711.57 for the bonds, and the outstanding principal was more than $10.7 million, while Jennings estimated that the total balance owed was $13 million. Dkt. No. [80-3] at ¶ 21. VP also knew that there were outstanding liens on the collateral, but Jennings does not know if it knew that the 2005 Capital Notes existed. Id. at ¶¶ 25-26. Before consummating the transaction, VP conducted due diligence, which Hannon–Plaintiff's asset manager–described as understanding the related collateral's value and researching MBC since it has a full-faith-and-credit obligation to pay the bonds. Id. at ¶¶ 27-28. At that time, Plaintiff only cared about what other liens were on the property which secured the 1996 Bonds. Id. at ¶ 29.

On February 28, 2006, Bishop DeVeaux provided Plaintiff with a copy of a confidential document entitled "Morris Brown College - The Recovery Plan." Dkt. No. [93] at ¶ 94. This plan stated that MBC should "[t]ell the stakeholders the truth" and would "be transparant about everything that [MBC was] doing at the college." Id. at ¶¶ 95-96. And, it listed all of MBC's property and stated who held security interests on what property. The plan stated that "Capital Mortgage Corp." and its affiliates held security interests on twenty-one parcels of MBC's property. Id. at ¶ 97; Dkt. No. [80-3] at ¶ 36.

On March 22, 2006, U.S. Bank as trustee for the Plaintiff filed suit against MBC in the Superior Court of Fulton County for breach of its 1996 Bond obligations. Dkt. No. [93] at ¶ 98. By the summer of 2006, MBC was unable to pay its operating expenses, was unsuccessful in developing its property, and was unable to sell any other real property to pay its debts; MBC did not have the cash flow to pay its debts. Id. at ¶¶ 99-102.

### 1. Forbearance Agreement

Soon, Larry Jennings, Bishop DeVeaux, and Dr. Pritchett began to negotiate the Forbearance Agreement. Id. at ¶ 103. Jennings repeatedly asked during these negotiations who owned the 2005 Capital Notes but DeVeaux and Pritchett were "squirrelly in their answer." Id. at ¶ 103. DeVeaux never stated

that the Sixth District or AME owned them, Dr. Lewis from AME never told the Plaintiff who owned the notes, and Pritchett never informed Jennings that the 2005 Notes had actually been assigned to AME. Id. at ¶¶ 104-07.

AME, the Sixth District, and MBC were all represented by Douglass Selby of Hunton & Williams LLP during these negotiations. Id. at ¶¶ 47, 108-09. Selby had advised MBC that he did not feel he could represent it because he also represented AME, MBC's debt holder. Because he represented the debt holder, Selby advised that he could not "ethically advise the College on defensive mechanisms or strategies regarding any debt which is owned by AME Church." Id. at ¶ 111. Despite informing Pritchett of this conflict, Selby continued to represent MBC in connection with this agreement. Id. at ¶ 112.

Selby, like the others, never informed the Plaintiff that the 2005 Notes had been assigned to AME. Id. at ¶ 113. On July 5, 2006, in his handwritten comments on a draft of the forbearance agreement, Selby referred to the 2005 Notes as "Liptz," a misspelling of the prior 2005 Capital Notes' holder. Id. at ¶ 114. However, Selby knew that those Notes had actually already been assigned to AME and were no longer Lipsitz's as he was involved in AME's purchase of those Notes. Id. at ¶ 115.

14

On August 10, 2006, while the parties were negotiating the forbearance agreement, Alan Aycock–a consultant hired by MBC–e-mailed Selby, DeVeaux, Lewis, Pritchett, and Smith (an MBC Trustee) regarding his "thoughts on strategy to deal with Jennings / forbearance / protecting the AME Church." Aycock provided options outside of the agreement with Plaintiff, including "formally deed[ing] over the non-Jennings mortgage properties to the Church ahead of any foreclosure, judgment, or bankruptcy filing. This has two favorable features–protects the Church's financial interest and keeps the bulk of the College properties out of Jennings [sic] hands. This allows us to proceed with our real estate options while holding open the possibility of re-opening the College." Id. at ¶ 117.

On August 31, 2006, the Plaintiff and MBC entered into a forbearance agreement in which Plaintiff agreed to forbear its prosecution if MBC agreed to grant the Plaintiff additional collateral (Herndon Stadium, Gaines Hall, Furber Cottage, and Wilkes Hall). Id. at ¶ 118-19.[4] Additionally, AME agreed to subordinate its security interest in Herndon Stadium without a request for anything in exchange from Plaintiff. Id. at ¶¶ 119, 137. In Exhibit E to the

_____

[4]Plaintiff had initially requested that MBC grant Plaintiff a lien on all its property but MBC was unwilling to provide that collateral. Dkt. No. [80-3] at ¶ 81.

AO 72A
(Rev.8/82)

Forbearance Agreement, AME represented that it held an interest in the subordinated property by virtue of the 1970 Bonds. However, that interest was actually obtained via AME's purchase of the 2005 Notes. Id. at ¶ 120-21. Based on Exhibit E, Plaintiff understood that only the 1970 Bonds' collateral was at issue during this transaction and saw no reason to review public records regarding MBC's other debt instruments in its due diligence. Id. at ¶¶ 122-23.

In sum, Plaintiff was not aware that AME had acquired the 2005 Notes when it signed the forbearance agreement, but it did know that AME had purchased the 1970 Bonds by the summer of 2006. Id. at ¶ 129; Dkt. No. [80-3] at ¶ 49. Had Plaintiff been aware of that fact, it would have demanded additional collateral in the forbearance agreement and would have required that the 2005 Notes' collateral be subordinated to Plaintiff's interest in that property. Dkt. No. [93] at ¶ 130. Plaintiff now believes that due to MBC's precarious financial position and AME's support of the college, AME would have agreed to subordinate its property. Id. at ¶ 131. However, at the time, Plaintiff thought that it, MBC, and AME were "working as a team" and were all providing full disclosure of their intents. Id. at ¶¶ 132-33. In fact, Selby referred to MBC, the Plaintiff, and the Sixth District as a "team," and Dr. Pritchett told Plaintiff that

he would be transparent with all MBC issues. Id. at ¶ 134-35. Ultimately, Plaintiff relied on MBC to disclose who owned the 2005 Notes. Id. at ¶ 136.

But, Jennings did admit that when it learned AME had purchased the 1970 Bonds, it thought AME was trying to keep MBC's assets from being attached by other creditors, and he recognized that AME was an insider who was less likely to take adverse action. Dkt. No. [80-3] at ¶ 50. Jennings also initially thought that AME's attempted foreclosure on Middleton–to which Plaintiff was a junior interest to AME–was an attempt to strip Plaintiff of its security interest in that property. But, following AME's foreclosure retraction and their attempts to work as a "team," Jennings thought that they could work together. Id. at ¶ 52. However, the parties' relationship was "tense" during the attempted foreclosure. Id. at ¶ 53.

As to due diligence for this agreement, U.S. Bank as Plaintiff's trustee did order and obtain a title search to investigate a possible reversionary interest affecting the administration building but did not complete a search of any other building because the Bonds only provided a metes and bounds description of the property and did not list the buildings by name. Id. at ¶ 97.

Following the execution of the Forbearance Agreement's, AME and Plaintiff negotiated the Subordination Agreement over several months. Dkt. No.

[93] at ¶ 138. However, prior to that agreement, Plaintiff learned that AME owned the 2005 Notes on January 25, 2007, the date MBC provided Plaintiff with the deed to secure debt and security agreement. Dkt. No. [80-3] at ¶ 99. Plaintiff thought it had been duped. Id. at ¶ 100. But, on April 11, 2007, U.S. Bank as trustee for Plaintiff signed the Subordination Agreement with AME. Dkt. No. [93] at ¶ 138.

Soon after the Forbearance Agreement expired, MBC again defaulted on its obligations to the Plaintiff. Id. at ¶ 139. Plaintiff resumed its prosecution of the lawsuit, and in December 2007, Plaintiff was awarded a judgment against MBC for $13,665,740.42. Plaintiff then recorded a writ of *fieri facias*, creating a lien on all of MBC's Fulton County property. Id. at ¶ 140.

Jennings testified that Plaintiff's position in entering into the forbearance agreement was the same as it would have been without entering into the agreement, except that Plaintiff received a first lien on the stadium by doing so. Dkt. No. [80-3] at ¶ 129. But, he did not realize until after the forbearance period that MBC was being irresponsible and decided to obtain a judgment to seal off other creditors. Id.

### 2. Conduct Since the Judgment

By virtue of its judgment, Plaintiff has judgment liens on most of MBC's

18

property. Id. at ¶ 109. Plaintiff has already foreclosed on Jordan Hall and a

portion of the stadium property, amounting to receipt of $1,180,000 toward

satisfying the judgment. Id. at ¶ 111. However, according to Plaintiff, it has not

exercised any rights on property on which it holds a second-position lien

interest for a variety of reasons. In some instances, the property is subject to a

reversion, and in some, it is not sure what it would have to pay to satisfy the

first lien. Id. at ¶ 114. However, Plaintiff has never asked AME what it would

cost to purchase the first liens on Gaines Hall, Wilkes Hall, Furber College, or

Middleton. Id. at ¶ 115.

Although it has had a first lien interest in the stadium since April 2007,

Plaintiff has not foreclosed because it determined it did not make good business

sense. Id. at ¶ 116. If it foreclosed, Plaintiff would not be able to obtain the

revenue-stream from rents, and the property would change from tax-exempt to

taxable. Id. at ¶¶ 121-22. GTAS also has the right to "exercise any right, power

or remedy permitted to it by law" because MBC has defaulted under the 1996

Security Agreement. Id. at ¶ 118.

As of December 2011, MBC has only 53 students enrolled and has

practically ceased operations. Id. at ¶ 141. Little–if any–maintenance has been

performed on the campus in years: the buildings have been stripped of fixtures,

plumbing, and valuables; the property is overgrown with weeds; and, many buildings have been boarded up. Id. at ¶ 142. In January 2010, buildings on the campus had to be razed due to deterioration, illegal dumping, and because the buildings had become "a haven for criminal activity." Id. at ¶ 143. Those buildings had not been maintained since 2006 and could not have been rehabilitated. Id.

## F. Value of MBC's Property

The parties dispute the current value of MBC's property and more specifically its value at the time of the forbearance agreement and judgment. Compare Dkt. No. [80-3] at ¶ 133 with Dkt. No. [93] at ¶ 133. However, a broker, whom Plaintiff uses internally as a guide, valued MBC's property at $46.9 million in 2008, though Plaintiff disputes whether the evaluations are accurate. Dkt. No. [80-3] at ¶ 139.

## G. Reversionary Interest

Nearly all of Plaintiff's secured property is subject to a reversionary interest held by Clark Atlanta University (the original grantor). That interest states that should the property not be used for educational purposes, the property will revert back to the grantor. Dkt. No. [93] at ¶ 144. Thus, Plaintiff's interest in the stadium which is subject to that interest "could be worth zero."

Id. at ¶ 145. However, Plaintiff was aware by June 2006 that some property was subject to a reversionary interest but it was not concerned because it did not believe those interests impacted the investment. Dkt. No. [80-3] at ¶ 102.

**H. This Suit**

Plaintiff filed suit against the Defendants on April 8, 2011, asking this Court to: 1) declare that Plaintiff's liens held by U.S. Bank on the 1970 and 2005 Collateral are superior to those held by AME; 2) declare that AME's liens (the 1970 Bonds lien and the 2005 Capital Notes lien) are extinguished; 3) determine that AME is the alter ego of MBC and is thus responsible for MBC's outstanding debts; 4) find that AME and MBC committed fraud and conspired to commit fraud; and 5) award attorney's fees in light of the Defendants' punitive behavior. AME initially filed a motion to dismiss Plaintiff's fraud claim, and the Court ordered Plaintiff to replead its claims. Dkt. No. [55]. Plaintiff has since filed an amended complaint [56].

Defendant AME now moves to dismiss Plaintiff's fraud claim for failing to state a claim and lacking sufficient particularity. Additionally, AME has moved for summary judgment on all of Plaintiff's claims, and MBC has joined this motion. The Court will consider each motion in turn.

21

## II. Discussion

### A. Motion for Summary Judgment

#### 1. Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence

22

is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

### 2. Fraud

Defendants initially argue that Plaintiff's fraud claim is barred by the statute of limitations.

23

> Under Georgia law, a four year statute of limitations applies to
> fraud claims. O.C.G.A. § 9–3–31; <u>Shapiro v. S. Can Co.</u>, 185 Ga.
> App. 677, 365 S.E.2d 518, 519 (1988) (statute of limitations for
> fraud with economic loss is the same as for the recovery of
> personal property). This limitations period begins to run at the time
> the plaintiff sustains actual damages from the fraud. <u>Green v.
> White</u>, 229 Ga. App. 776, 494 S.E.2d 681, 685 (1997).
> Accordingly, the clock begins to tick at the time the first bit of
> injury arises; indeed "[t]he cause of action arises ... before the
> client sustains all, or even the greater part, of the damages...."
> <u>Jankowski v. Taylor, Bishop & Lee</u>, 246 Ga. 804, 273 S.E.2d 16,
> 17–18 (1980).

<u>Curtis Inv. Co. v. Bayerische Hypo-und Vereinbank, AG</u>, 341 F. App'x 487,

494-95 (11th Cir. 2009).

Defendants argue that Plaintiff's fraud claim was barred August 31,

2010–four years from the date of the forbearance agreement. Because Plaintiff

argues that the Defendants committed fraud when AME lied about which debt

provided security for the stadium, and more generally, omitted that it held the

2005 Capital Notes at all, Plaintiff was injured when it agreed to forbear in

exchange for just the stadium's subordination and the collateral MBC pledged.

Alternatively, Defendants also argue that if the Defendants' alleged omission

and misrepresentation tolled the fraud–as Plaintiff was unaware of the true debt

holder–Plaintiff would still be barred as Plaintiff admits that it had actual notice

that AME was the 2005 Capital Notes holder on January 25, 2007 when it

24

received a deed identifying AME's interest, and Plaintiff did not file suit until March 2011.

Plaintiff argues in return that it was not injured until AME and the Plaintiff executed the subordination agreement in April 2007. Because the forbearance agreement was essentially a two-step process–forbearance agreement and then subordination agreement–without the subordination agreement, the forbearance agreement was not completed, and Plaintiff was not injured.

However, the Court finds that Plaintiff was injured once it was induced to forbear in exchange for the collateral and subordination that MBC and AME agreed to, respectively. Plaintiff's entire damages argument is that had it known that AME had obtained the 2005 Capital Notes, it would have demanded additional subordination. Thus, by the same reasoning, Plaintiff was injured for statute of limitations purposes once it agreed to forbear for less than what Plaintiff would have required had it known the truth of the misrepresentation and the omission.

As well, even assuming *arguendo* that Defendants committed actual fraud, Plaintiff's actual notice of AME's ownership by January 25, 2007 coupled with the previous injury bars Plaintiff's claim. See Shipman v. Horizon

Corp., 267 S.E.2d 244, 246 (Ga. 1980) (""[W]here ... actual fraud is the

gravamen of the action [,] ... [T]he statute of limitations is tolled until the fraud

is discovered or by reasonable diligence should have been discovered."). Thus,

the Court **GRANTS** Defendants' Motion as to Plaintiff's fraud and derivative

conspiracy claims. See Dyer v. Honea, 557 S.E.2d 20, 24 (Ga. Ct. App. 2001)

("The cause of action for civil conspiracy lies not in the conspiracy itself, but in

the underlying tort committed against the plaintiff and the resulting damage.").[5]

### 3. Declaratory Judgment Claims

Defendants next argue that Plaintiff's declaratory judgment claims are

improper because justiciable controversies do not exist and Plaintiff's injuries

are merely conjectural.  The Declaratory Judgment Act provides in relevant

part:

> In a case of actual controversy within its jurisdiction, . . . any court of
> the United States, upon filing of an appropriate pleading, may declare
> the rights and other legal relations of any interested party seeking such a
> declaration, whether or not further relief is or could be sought. Any such
> declaration shall have the force and effect of a final judgment or decree
> and shall be reviewable as such.

28 U.S.C.A. § 2201(a).  Federal jurisdiction under this code section is limited to

actual controversies pursuant to the federal judicial power authorized under

---

[5]Accordingly, Defendants' Motion to Dismiss these claims is **MOOT**.

Article III, Section 2 of the United States Constitution.  Tilley Lamp Co. v. Thacker, 454 F.2d 805, 807-8 (5th Cir. 1972).  Thus, the threshold question for all cases arising under the Declaratory Judgment Act is whether a justiciable controversy exists.  Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 272, 61 S. Ct. 510, 512, 85 L. Ed. 826 (1941).  District courts determine whether a controversy  exists on a case-by-case basis.  Wendy's Int'l v. City of Birmingham, 868 F.2d 433, 435-36 (11th Cir. 1989).  At an "irreducible minimum" the party seeking declaratory judgment must show: '(1) that he personally has suffered some actual or threatened injury as a result of the alleged conduct of the defendant; (2) that the injury fairly can be traced to the challenged action; and (3) that it is likely to be redressed by a favorable decision.'" Valley Forge Coll. v. Americans United, 454 U.S. 464, 472, 102 S. Ct. 752, 758, 70 L. Ed. 2d 700 (1982); Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co., 68 F.3d 409, 414 (11th Cir. 1995).

    Taking the facts most favorable to the Plaintiff, the Court finds that actual controversies with threatened injuries exist in this case. First, Plaintiff has produced a genuine issue of material fact as to whether the Defendants are alter egos of each other, and thus, whether AME can even hold a lien on MBC's property. See infra; O.C.G.A. § 44-6-3 ("As a general rule, a party may not hold

27

a lien on his own property[.]").  Second, because MBC no longer lists the 1970

Bonds or 2005 Capital Notes as debts to anyone, much less AME, and per Dr.

Pritchett it was MBC's understanding that those debts would never be repaid by

MBC, there is an issue of fact as to whether the original security interests were

extinguished when AME purchased those debts. See O.C.G.A. § 44-14-60

(when a debt is paid in full, the securing property's title reverts back to the

grantor).

Defendants argue that because Plaintiff has not "taken available action on

the majority of its collateral or its judgment liens," Plaintiff does not have

evidence that it has been injured by AME's priority liens. Dkt. No. [80-1] at 25.

However, first, Defendants have cited no authority for their position that

Plaintiff must have attempted to foreclose on all property available to it–and

pay off AME's priority interest to do so–to seek a declaratory judgment in this

case when the parties' security-interest priority is clear. As well, with much of

the property subject to Clark Atlanta's reversionary interest, there is a

possibility that Plaintiff could lose the property in an attempt to satisfy

Defendants' requirement. As well, the Court notes that all that is needed under

the Declaratory Judgment Act is a "threatened" injury. With AME and MBC

having completed no maintenance or repairs on the subject property, the value

of the collateral decreases each day. Thus, this depreciation of property alone is a sufficient injury–both real and threatened–to Plaintiff's interests. Therefore, Defendants' Motion is **DENIED** as to the declaratory judgment claims.

### 4. Alter Ego

Defendants next argue that Plaintiff cannot prove that AME is the alter ego of MBC.

> To establish the alter ego doctrine[,] a plaintiff must show that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or by confusing otherwise separate properties, records or control, or by showing that a disregard of the corporate entity made it a mere instrumentality for the transaction of the other entity's own affairs and that there is such unity of interest and ownership that the separate personalities of the corporations no longer exist. The evidence must be such that to adhere to the doctrine of corporate entity would promote injustice or protect fraud.

NEC Techs., Inc. v. Nelson, 478 S.E.2d 769, 775 (Ga. 1996) (internal citations and quotations omitted).

Defendants first argue that because AME is not MBC's owner or shareholder, AME cannot be the alter ego of MBC. See Gwinnett Prop., N.V. v. G+H Montage GmbH, 453 S.E.2d 52, 56-57 (Ga. Ct. App. 1994) (finding that an unrelated corporation could not be pierced for the debts of an individual when it was uncontroverted that the individual had no interest in the

29

corporation, and finding that attempting to use the alter ego theory in reverse–piercing the corporate veil to hold the corporation liable for personal debts of an unrelated debtor–was improper). However, MBC was chartered as a non-profit corporation and "[s]aid corporation has no capital stock," <u>see</u> Charter, Dkt. No. [56-1] at 2; thus, no one–much less AME–can be a *per se* owner of MBC. However, MBC was founded by AME, declared itself an institution of AME, and its Charter states that it must obey any "mandate or directive" issued by AME. Thus, the Court finds that there is an issue of fact regarding whether AME "owns or controls" MBE for alter ego purposes.

As well, Defendants argue that "actions taken for the benefit of a debtor corporation [are] not abuse[s] of the corporate form." Dkt. No. [107] (citing <u>Pazur v. Belcher</u>, 659 S.E.2d 804 (Ga. Ct. App. 2008)). In <u>Pazur</u>, the alleged alter ego owner loaned the corporation $250,000 and then forgave the debt to facilitate the corporation's sale. The Georgia Court of Appeals found that "loans between a corporation and its owner, without evidence of actual abuse of the corporate form, do not support piercing of the corporate veil." <u>Id.</u> at 807. However, here, Plaintiff has created a genuine issue of fact as to whether Defendants abused the corporate form via AME's purchases. Unlike <u>Pazur</u>, AME did not just "forgive the loans"; rather, AME took priority security

interests over the third-party creditors, effectively shielding MBC's assets from foreclosure. As well, AME made clear that it wanted to assure the property remained with MBC and AME, and MBC's consultant suggested deeding all of MBC's property to AME to attain this protection. Further, MBC no longer recognizes these loans as outstanding debts, even though AME retains secured interests based upon those debts. Thus, the Court finds there is an issue of fact regarding whether AME and MBC abused the corporate form through AME's purchases of the 1970s Bonds and 2005 Capital Notes and whether equity would requiring piercing the veil.

Finally, the Defendants argue that Plaintiff has not proven that MBC was insolvent when AME purchased the Notes. However, the Court finds that there is an issue of fact regarding what MBC was worth at the time the loan transactions occurred. Thus, Defendants' motion is **DENIED** on the alter ego claim.

### 5. Attorney's Fees

Because there is an issue of fact regarding whether AME intentionally purchased MBC's loans to shield its assets from third-party creditors and thus acted in bad faith, Defendants' Motion is **DENIED** at this time as to attorney's fees.

31

### III. Conclusion

Defendant MBC's Motion to Join and Adopt AME's Motion for Summary Judgment [89] is **GRANTED**, and Defendants' Motion for Summary Judgment [79] is **GRANTED, in part** and **DENIED, in part**. Plaintiff's declaratory judgment, alter ego, and attorney's fees claims remain, and Plaintiff's fraud and conspiracy claims are dismissed. Accordingly, Defendant AME's Motion to Dismiss Counts 4 and 5 [62] is **DENIED as MOOT**.

This Court also **REFERS** this action to Chief Magistrate Judge Janet F. King for magistrate assignment to mediate this matter. If this suit is not resolved in mediation with a Magistrate Judge, the parties' joint, proposed pre-trial order will be due 30 days after the failed mediation.

**SO ORDERED**, this _ 21st _ day of August, 2012.

RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)